# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Action No. 2018-0004 |
| | ) |
| DEQUAN FORDE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
 *For the United States*

**Kia D. Sears, Esq.,**
St. Croix, U.S.V.I.
 *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Dequan Forde's ("Defendant" or "Forde") Motion to Suppress Statements (Dkt. No. 13); the Government's Opposition to Defendant's Motion to Suppress Statements (Dkt. No. 16); and testimony and exhibits admitted at the suppression hearing.[1] For the following reasons, the Court will deny Defendant's Motion to Suppress Statements.

### I.  BACKGROUND

On February 7, 2018, the Government filed an Information against Defendant charging him with the following: (1) Conspiracy to Possess Marihuana with Intent to Distribute, in violation

---

[1] While the parties also submitted supplemental briefing as ordered by the Court, these filings were limited to addressing the issues raised by Defendant in his Motion to Suppress Evidence (Dkt. No. 14), which the Court denied by separate Order. (Dkt. No. 55).

of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) and 846 (Count I); (2) Possession of Marihuana with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) (Count II); and (3) Possession of Marihuana on Board Aircraft with Intent to Distribute, in violation of 21 U.S.C. §§ 959(c)(2) and 960(a)(3) and (b)(4). (Dkt. No. 8).[2]

At the suppression hearing, U.S. Customs and Border Protection ("CBP") Officers Richard Anderson ("Officer Anderson") and Jonas Fevrier ("Officer Fevrier") testified, and exhibits offered by the Government and Defendant were admitted into evidence. The following facts emerged from the record established at the suppression hearing.[3]

On January 31, 2018, at approximately 10:00 p.m., CBP Officers Anderson and Fevrier—as part of a program call "Operation Gun Dog"—were conducting x-ray examinations of all luggage from American Airlines Flight 2317, which arrived from Miami, Florida to St. Croix's Henry E. Rohlsen airport.[4] Officer Anderson—who was operating the x-ray machine—testified that a blue Nautica suitcase placed on the x-ray showed an "anomaly" on the screen, which, based on his training and experience, looked like contraband. (Gov't Ex. No. 1). Officer Anderson took a photograph of the "anomaly" with his cell phone as the suitcase appeared on the x-ray screen.

---

[2] Prior to the Information, the Government commenced this action by filing a Criminal Complaint on February 1, 2018. (Dkt. No. 1).

[3] The Court bases the background factual discussion in this section on the record established at the suppression hearing. Unless otherwise specifically indicated, the facts recounted herein come from the testimony of Officers Anderson and Fevrier, and the exhibits admitted into the hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Dequan Forde is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[4] According to Officer Anderson, on this evening, all bags from the Miami flight were subjected to the x-ray search as part of "Operation Gun Dog." Officer Anderson explained that "Operation Gun Dog" is conducted by CBP, sometimes with other federal agencies, as part of the "anti-terrorism contraband team."

(Gov't Ex. No. 2). He then instructed Officer Fevrier to pull the blue suitcase off the machine and open it. The suitcase, which was locked and had a checked baggage tag under Forde's name, was opened by Officer Fevrier who examined its contents. Officer Fevrier's search revealed a blue pull-string laundry bag containing two plastic wrapped bundles of a green leafy substance. (Gov't Ex. Nos. 3-5). The officers closed the suitcase and placed it back on the baggage belt so that they could observe the baggage claim area to see who would retrieve it. Officers Anderson and Fevrier then went out to the baggage claim area to intercept the person who would pick up the suitcase.[5]

While at the baggage claim area, the officers observed Forde retrieve the Nautica suitcase from the baggage belt. Forde also had two carry-on bags in his possession: a backpack and a small bag. As Officers Anderson and Fevrier approached Forde,[6] two other CBP officers—Officers King and Pabon—were standing nearby as backup. All four officers had their uniforms on, which showed their CBP badges, and all of them were armed.

Accompanied by Officer Fevrier, Officer Anderson asked Forde for identification[7] and inquired as to whether the bags were his, if he had packed them, and if he knew the contents of the bags.[8] Officer Fevrier testified that Forde said the bags were his, that he had packed them, and that

---

[5] In his testimony, Officer Anderson confirmed that at this point, it was his "intention" to arrest the individual who was going to claim the package and get the contraband.

[6] Officer Anderson testified that the baggage claim area at St. Croix's Henry E. Rohlsen Airport is a semi-enclosed room which is open to the public and the street. Officer Anderson stated that, when he approached Forde, he was standing between him and the exit.

[7] According to Officer Anderson's Report, Forde presented him with a U.S. Passport with the name Dequan Forde. (Def. Ex. No. 1).

[8] In his testimony and Report, Officer Anderson stated that his question was limited to asking Forde whether the suitcase belonged to him. But Officer Fevrier testified that Officer Anderson actually asked the three questions listed above. The Court will credit the latter's testimony describing the encounter with Forde.

they had been in his possession the whole time. Officer Anderson further testified that Forde was not physically touched, nor was he placed in handcuffs, since he was not considered to be under arrest at that time.[9] After this initial encounter with Officers Anderson and Fevrier, all four officers escorted Forde to the CPB's secondary screening area located inside the airport.

According to Officer Anderson, the secondary area is a room that measures approximately 20 x 20 feet and contains two examining tables, some computers, and chairs. The room, which has windows, is secured with a lock that requires anyone entering and exiting the room to punch in a security code. When the officers brought Forde into the secondary area, an immediate pat-down of his person was conducted for weapons. Forde's bags were placed on the table and he was instructed to take a seat directly across from the officers and the bags.

Officer Anderson testified that he once again asked Forde if the bags belonged to him—a question which Officer Anderson stated was meant to get a "binding oral declaration" from Forde. According to Officers Anderson and Fevrier, Forde responded "yes." The officers proceeded to open and examine the contents of the bags. Officer Anderson admitted that, at this point, they had no warrant or consent from Forde to open the bags. Officer Anderson testified that, based on his training, CBP officers like him had "border search authority" to examine luggage coming in and out of the Virgin Islands without a warrant. He also stated that in conducting these searches, CBP's focus is to "look[] for stuff that Customs look for. It could be merchandise, it could be, I mean if we find contraband, of course, we're going to react to it, because that's just part of our job."

Officer Anderson searched the blue suitcase, while Officer Fevrier searched the backpack and Officer King searched the third bag. Officer Fevrier testified that when he searched the

---

[9] As he was speaking with Forde, Officer Anderson testified that there were still several people milling around the baggage claim area.

4

backpack, he found a small baggie of marijuana in the pocket of a pair of blue jeans. (Gov't Ex. No. 7). Both Officers Anderson and Fevrier testified that, as soon as Officer Anderson opened the suitcase and exposed the laundry bag within it, Forde blurted out: "That's weed." Officers Anderson and Fevrier testified that, prior to Forde's statement, none of the officers had asked Forde any other questions, nor had they said or done anything that would have elicited such a response.[10] Forde was arrested and was again subjected to a pat-down by Officer King. Forde was then turned over to Homeland Security Investigations ("HSI") for further investigation and questioning.

The green leafy substance contained in the two vacuum-sealed packages found in the blue suitcase later tested positive for marijuana. The total weight of the marijuana was approximately 20 pounds (or approximately 9.40 kilograms). (Gov't Ex. No. 6). It is undisputed that none of the officers read Forde his *Miranda* rights prior to his questioning at either the baggage claim or at secondary inspection.

Forde seeks to suppress any statements made to law enforcement officers, claiming they were obtained in violation of his *Miranda* rights and the Fifth Amendment. (Dkt. No. 13 at 1). Forde contends that he was subject to custodial interrogations when he was asked to provide two "binding oral declarations" confirming his ownership of the bags where the contraband was found and when he observed the opening of his suitcase in the secondary area and he allegedly offered an incriminating response by saying, "that's weed." *Id*. at 3. Forde argues that because these interrogations occurred without the benefit of *Miranda* warnings, they were "obtained in violation of [his] privilege against self-incrimination, [and] his right to counsel as guaranteed by the Fifth and Sixth Amendments to the United States Constitution." *Id*. at 4. Forde further argues that any

---

[10] The search of the third bag did not result in the discovery of any additional contraband.

evidence obtained as a result of these statements must also be suppressed as "fruit of the poisonous tree." *Id*. Finally, Forde asserts that any statements, admissions or confessions were made involuntarily and in violation of the Due Process Clause of the Fifth Amendment. *Id*.[11]

In its opposition, the Government first contends that *Miranda* did not apply at the time of Forde's initial encounter with CBP officers because it occurred in a public area (the baggage claim) and Officer Anderson's questions were limited to asking for his identification and whether the luggage belonged to him. (Dkt. No. 16 at 2). Per the Government, because Forde at this point was not seized, detained, placed in custody, or interrogated, *Miranda* did not apply, rendering Forde's response to Officer Anderson's questions admissible. *Id*.

Second, while the Government concedes that Forde was in custody when he was escorted into the secondary screening area, it argues that *Miranda* was also not applicable during this encounter since the border exception applied when the officers asked Defendant for the second "binding oral declaration." *Id*. at 2-3. According to the Government, the fact that Forde was in custody when customs officers questioned him is "not dispositive for the purposes of *Miranda* as long as those questions were geared towards determining the admissibility of [the defendant] and his bags." *Id*. at 4. The Government maintains that the CPB officers only questioned Forde regarding his ownership of the bags and did not inquire as to their content or the criminal conduct related to that content. *Id*. Accordingly, the Government argues that no *Miranda* violation

---

[11] In his Motion to Suppress Statements, Forde further alleges that after he was arrested and read his *Miranda* rights, he asked for counsel and refused to answer questions. (Dkt. No. 13 at 2). However, after he had already invoked his right to counsel, officers asked him to consent to a search of his cell phone, and Forde allegedly provided consent in written and oral form. *Id*. Forde claims that the request for his consent was also in violation of his constitutional rights and should thus be suppressed, along with evidence obtained as a result of his purported consent. *Id*. at 4. The Government, while disputing the sequence of events Forde alleges here, nevertheless represented that it "will not attempt to utilize any of the data [from Forde's cell phone] at trial." (Dkt. No. 16 at 4). Accordingly, the Court finds this issue moot and will not address it here.

occurred, and Defendant's statements should not be suppressed. *Id*. Finally, the Government argues that Forde's exclamation of "that's weed," was offered voluntarily by Defendant, and was not in response to any of the officers' questioning or any conduct by the officers likely to elicit a response. *Id*. Thus, according to the Government, that statement also should not be suppressed. *Id*.

## II. APPLICABLE LEGAL PRINCIPLES

### A. *Miranda*

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST., amend. V. In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). *Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984). *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). "[T]he presence of both a

7

custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 395 (D.V.I. 1997); *see also Alston*, 34 F.3d at 1244 (same); *United States v. Mattox*, 2018 WL 3622777, at *3 (M.D. Pa. July 30, 2018) (same); *United State v. Mejia*, 2016 WL 7191630, at *19 (D.V.I. Dec. 10, 2016) (same); *Booker v. United States*, 2010 WL 2985982, at *12 (D.N.J. July 26, 2010) (same).

A suspect is "in custody" when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal citation and quotation marks omitted). "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe)" in which courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (internal quotations omitted) (emphasis removed)). To conclude that a person who has not been arrested is in custody, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler,* 496 F.2d at 799 (internal quotations omitted)). "[T]he relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v.*

*Killingsworth,* 118 F. App'x. 649, 650 (3d Cir.2004) (citing *Stansbury v. California,* 511 U.S. 318, 325 (1994)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

### B. Voluntary Statements

Statements obtained in violation of *Miranda* are inadmissible at trial. *See Michigan v. Mosely*, 423 U.S. 96, 100 (1975). However, "[a]ny statement given freely without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478. Where a defendant challenges the voluntariness of a statement under the Due Process Clause of the Fifth Amendment, the government retains the burden of "proving, by a preponderance of the evidence, that [a defendant's] . . . confession was voluntarily given." *United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 326 (3d Cir. 1975) (internal citation and quotation marks omitted); *see also Jacobs*, 431 F.3d at 108.

"A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker." *Id*. (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973)). Accordingly, a confession will not be found involuntary unless "it was the product of police overreaching." *Swint*, 15 F.3d at 289 (internal citation and quotation marks omitted); *see also Jacobs*, 431 F.3d at 108 ("A necessary predicate to a finding of involuntariness is coercive police activity.") (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Further, there must also be a "causal connection between the police conduct and the

9

confession." *Id*. Statements made to law enforcement that are involuntary are inadmissible as evidence. *Jacobs*, 431 F.3d at 108 (citing *Schneckloth*, 412 U.S. at 225-26).

## C. Application of *Miranda* in the Border Context

In *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006), the Third Circuit examined at length the application of *Miranda* rules in the context of immigration inspections at international borders, holding that "normal *Miranda* rules simply cannot apply to this unique situation at the border." *Id.* at 529 (citing *United States v. Gupta*, 183 F.3d 615, 617-18 (7th Cir. 1999)); *see also United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) ("[N]ormal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States.") (citing *Kiam*, 432 F.3d at 529-30). Immigration and Customs officers have a responsibility to inspect entrants at our borders, and "[s]uspicion of criminal conduct cannot overrule [that] simultaneous responsibility . . . ." *Kiam*, 432 F.3d at 531 (citing *United States v. Silva*, 715 F.2d 43, 48 (2d Cir.1983) (holding that Customs officers were "duty-bound to determine whether Silva was entitled to enter the country with her effects" regardless of their suspicion of criminal conduct, and *Miranda* warnings were not required)). Further, an individual seeking to enter the United States "does *not* have a right to remain silent." *Id.* at 529 (citing *Gupta*, 183 F.3d at 617). As such, individuals seeking to enter the United States may be questioned without *Miranda* warnings even if subject to custody and may be "taken out of a primary inspection line for secondary questioning . . . ." *Id.* at 529-30 (citing *Gupta*, 183 F.3d at 617-18). While *Kiam* specifically addressed immigration screening at international borders, a Third Circuit panel later relied on *Kiam* to apply its holding to the Customs inspection context. *St. Vallier*, 404 F. App'x at 656 n.4. ("[W]e find no material distinction between questioning an alien to determine whether

he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country.") (citing *Kiam*, 432 F.3d at 531; *Silva*, 715 F.2d at 48).

However, the Third Circuit recognized that even in the border context, "eventually, a 'line must be drawn,' beyond which *Miranda* warnings are required." *Kiam*, 432 F.3d at 530 (quoting *Gupta*, 183 F.3d at 618). Where an "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution . . . this line has been crossed." *Id.* The line is not crossed, however, where there is "mere overlap" between questions geared towards an assessment of the admissibility of an individual or his effects and questions bearing on a potential criminal prosecution. *Kiam*, 432 F.3d at 530 n.6; *see also St. Vallier*, 404 F. App'x at 657 (noting "the practical reality that determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity" and holding that "questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*"). While "an [individual's] admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only practically relate to a potential criminal prosecution," the fundamental inquiry is whether a customs official's questions "bear upon both admissibility and criminal conduct, while not relating solely to the prosecution of the latter . . . ." *St. Vallier*, 404 F. App'x at 657-58 (citing *Kiam*, 432 F.3d at 530 n.6). If so, the questions are permissible and the answers are admissible.

### III.  DISCUSSION

As recognized by the Third Circuit in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), and detailed in this Court's separately filed Memorandum Opinion, (Dkt. No. 56), Congress has maintained an internal customs border between the mainland United States and the Virgin Islands

11

since the United States acquired the Virgin Islands from Denmark in 1917. The Third Circuit has further held that customs officers may perform routine customs searches of individuals and luggage *departing* the Virgin Islands for the continental United States without a warrant or probable cause. *Hyde*, 37 F.3d at 117. Although this Court has concluded in a separately filed Memorandum Opinion that the warrantless and suspicionless searches of individuals and luggage *arriving* in the Virgin Islands from the continental United States are unreasonable under the Fourth Amendment, (*see* Dkt. No. 56 at 23), the Court did not suppress the evidence discovered as a result of the search conducted herein based on the Court's finding that CBP officers stationed at the internal customs border have performed their duties for at least the past 20 years under the objectively reasonable good-faith belief that individuals and their luggage arriving in the Virgin Islands from the continental United States are subject to the same customs inspections as individuals and their luggage departing the Virgin Islands for the continental United States, *id.* at 30-31. This includes the authority to ask routine customs questions for purposes of determining the admissibility of persons and effects.

### A.    Defendant's Statements to Officer Anderson at Baggage Claim and Secondary Inspection

The Court will first examine Forde's interaction with law enforcement from his initial encounter with Officer Anderson at the baggage claim area to the point at the secondary inspection area when Officer Anderson again asked Forde about ownership of the bags. The Court will consider the questions that Officer Anderson posed to Forde in both instances in light of Officer Anderson's objectively reasonable good-faith belief that his authority to ask questions regarding the admissibility of persons and their effects as they arrived at the internal customs border from the continental United States was identical to the authority he possessed to pose such questions to individuals departing the Virgin Islands for the continental United States. In other words, the Court

will examine Officer Anderson's questions as if they had occurred at the equivalent of an international border—as the internal customs border between the continental United States and the Virgin Islands is treated with respect to individuals and luggage departing the Virgin Islands for the continental United States. In this context, "normal *Miranda* rules simply cannot apply . . ." *Kiam,* 432 F.3d at 529; *see also United States v. Barrett*, 2011 WL 4443432, at *8 (D.V.I. Sept. 22, 2011) ("At the border, customs officers' questioning of an entrant to determine whether the person or his effects is admissible is not subject to the requirements of Miranda.").[12]

The issue here is thus whether Officer Anderson's questions "crossed the line" established by the Third Circuit in *Kiam* when he queried Forde about the bags without providing *Miranda* warnings. If Officer Anderson's questions "objectively cease[d] to have a bearing on the grounds for admissibility and instead only further[ed] a potential criminal prosecution," the questions crossed the line, and *Miranda* warnings were required. *Kiam*, 432 F.3d at 530; *see also United States v. Molina-Gomez*, 781 F.3d 13, 24 (1st Cir. 2015) (finding that *Miranda* warnings were required where CBP officers asked a defendant questions about his involvement with drug activity that "had nothing to do with whether or not to admit [the defendant] into the country."). If Officer Anderson's questions pertaining to the admissibility of Forde's bags into the United States simply "overlapped" with questions relevant to possible criminal conduct, then the questions did not cross the line and thus no *Miranda* warnings were required. 432 F.3d at 530 n.6; *St. Vallier*, 404 F. App'x at 657.

---

[12] While the parties dispute whether Forde was "in custody" during the initial encounter at the baggage claim area, the Court does not find the custody issue determinative under the circumstances here because, even if he were in custody, Forde's presence at the border would not entitle him to *Miranda* protections. *St. Vallier*, 404 F. App'x at 657 (finding *Miranda* "inapplicable to circumstances where border inspectors question persons seeking entry into the United States.").

13

The record demonstrates that the initial encounter between Forde and Officers Anderson and Fevrier involved Officer Anderson asking Forde three questions: (1) whether the bags belonged to Forde; (2) whether Forde had packed them, and (3) whether Forde knew the contents of the bags. Forde allegedly replied that the bags were his, he had packed them, and he had been in possession of them the entire time (therefore implying that he was aware of their contents). The record also shows that at the secondary inspection area, Officer Anderson again asked Forde whether the bags belonged to him.

The Court finds that Officer Anderson's questions during both instances did not cross the line established in *Kiam* because even though "they were arguably directed at determining whether [Forde] was involved in ongoing criminal activity, they were still integral to [Officer Anderson's] determination of whether [Forde's] effects could enter the country." *St. Vallier*, 404 F. App'x at 657. In other words, while Officer Anderson's queries undoubtedly elicited inculpatory responses from Forde, which could aid law enforcement in his criminal prosecution, the questions were basic and typical of the questions that CBP officers need to ask at the border as part of the exercise of their authority to determine the admissibility of persons and their effects into the United States. *See Kiam*, 432 F.3d at 530 (3d Cir. 2006) (finding that, even in circumstances where a customs officer "subjectively suspects criminal conduct in addition to inadmissibility . . . . [an officer] must obtain sufficient information to make a determination regarding admissibility and [] then decide whether to call in a criminal investigator."); *see also Silva,* 715 F.2d at 48 (holding that regardless of whether an immigrations inspector had probable cause to arrest for a criminal violation, a customs officer remained "duty-bound to determine whether [defendant] was entitled to enter the country with her effects" and *Miranda* warnings were not required). Here, since Officer Anderson's questions were limited to an inquiry into whether Defendant was the owner of the

bags, whether he packed them, and whether he was aware of their contents, "the mere overlap of the admissibility questioning with the elements of his criminal liability is not fatal." *Kiam*, 432 F.3d at 530 n.6.

Accordingly, because the questions at issue were objectively relevant to Officer Anderson's determination into Forde's admissibility, Forde was not entitled to *Miranda* warnings. Accordingly, no constitutional violation occurred here and Forde's statements in response to Officer Anderson's questions will not be suppressed.

**B.     Defendant's Statement to CBP Officers at Secondary Inspection— "That's Weed"**

Here, the Court focuses only on the incident in secondary inspection where Forde allegedly uttered "that's weed." In assessing the totality of the circumstances, the Court concludes that the Government has shown by a preponderance of the evidence that Forde's statement was voluntary.

With regard to the voluntariness of a statement, the Third Circuit looks to the "totality of circumstances," to ensure that the statement is "the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will and that the appellant's will was not overborne." *Swint*, 15 F.3d at 289 (internal citation and quotation marks omitted). These circumstances include taking into consideration:

> the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; [the defendant's] education; [the defendant's] physical condition; and [the defendant's] mental health. They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation.

*Swint*, 15 F.3d at 289 (internal citations omitted); *see also United States v. Rose*, 189 F. Supp. 3d 528, 538 (D.V.I. 2016) (same). Moreover "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry." *Jacobs*, 431 F.3d at 108. "If an individual's will is overborne or that person's capacity

for self-determination is critically impaired, her or his statements are involuntary," and thus not admissible into evidence. *Id.*

It is undisputed that Forde was subject to a custodial interrogation when he was transferred to the secondary inspection area. As presented, the evidence revealed that upon entering the room, Forde was seated across from CBP Officers Anderson, Fevrier, and King, as each of them took one of Forde's bags, opened them and examined their contents. Officer Anderson again asked Forde whether the bags belonged to him and Forde answered affirmatively. Then, when Officer Anderson opened the blue Nautica suitcase and exposed the blue laundry bag inside, Forde allegedly blurted out "that's weed."

At the suppression hearing, Officers Anderson and Fevrier testified that, except for Officer Anderson's lone question pertaining to the ownership of the bags, there were no other questions posed by the officers. Further, there was nothing in the officers' conduct that would have elicited such a response. Officer Anderson's innocuous act of opening the blue suitcase to expose its contents cannot be said to have evinced an intention to elicit an incriminating response from Forde. *See Bonner*, 469 F. App'x at 126-27; *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) ("Police may not, however, be held accountable for the unforeseeable results of their words or actions, . . . and to constitute an interrogation their conduct must reflect a measure of compulsion above and beyond that inherent in custody itself.") (internal citation and quotation marks omitted). Further, there was no evidence indicating that Forde was subject to any form of coercion. *United States v. Daniels*, 2010 WL 2163844, at *4 (E.D. Pa. May 27, 2010) ("[A]bsent deliberately coercive or improper tactics in obtaining [a] statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.") (quoting *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)).

Rather, Forde's response of "that's weed," is a voluntary statement on his part which was made without any prompting and thus does not warrant suppression. "*Miranda* warnings are not required before a volunteered or spontaneous statement that is not made in response to questioning, even if the suspect is in custody." *United States v. Cottman*, 497 F. Supp. 2d 598, 605 (D. Del. 2007) (citing *Miranda,* 384 U.S. at 444). "Spontaneous statements made 'without prompting' are not implicated by *Miranda* because they are not a product of custodial interrogation." *Rose*, 189 F. Supp. 3d at 547; *see also United States v. Young*, 233 F. App'x 114, 115 (3d Cir. 2007) (holding that a suspect's incriminating statements made immediately after police informed him of the crimes he was being charged with were spontaneous and voluntary, and not a result of custodial interrogation). Accordingly, based on the totality of the circumstances, the Court finds that Forde's statement of "that's weed" was voluntary or spontaneous and does not warrant suppression. *See Miranda*, 384 U.S. at 478 ("Any statement given freely without any compelling influences is, of course, admissible in evidence.").

## IV.  CONCLUSION

For the reasons discussed above, the Court will deny Defendant's Motion to Suppress Statements as it relates to the suppression of his statements to Officer Anderson at both the baggage claim and at the secondary inspection area of the airport.

An appropriate Order accompanies this Memorandum Opinion.

Date:   January 8, 2019                         _____/s/_____
                                                WILMA A. LEWIS
                                                Chief Judge